

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-19-00039-CR

_____

TODDRICK MATTHEWS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Bowie County, Texas
Trial Court No. 18F0588-005

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

After a Bowie County jury found Toddrick Matthews guilty of murdering his girlfriend, Sonjha Banks, he was sentenced to life in prison. In his sole issue on appeal, Matthews contends there was insufficient evidence to support the jury's verdict of guilt. Because we find there was sufficient evidence to support the jury's verdict, we affirm the trial court's judgment.

## I.      Background

Banks, the victim here, was Karen Henderson's first cousin. At trial, Henderson testified that she was fairly close to Banks and that they spent their childhood summer vacations together. According to Henderson, Banks and Matthews saw each other while they were both driving down the interstate, pulled off the road, and exchanged telephone numbers. Later, they began a dating relationship which lasted about a year.

Henderson described Banks as "a loving person, a kind person, [would] help anyone, do anything for anybody." She was always happy and had a smile on her face. Yet, Banks's personality changed when she began dating Matthews. Henderson stated, "It changed when things started happening in her life, and things started going wrong and she started shutting down, and I noticed that because she wasn't a happy person [any]more." Banks's relationship with Matthews was "deteriorating bad" and "wasn't going good at all." Henderson explained that Banks was afraid of Matthews and that, when Matthews was present, Banks would become quiet. Henderson testified, "She wouldn't say anything." Henderson also described one occasion when she heard Matthews tell Banks that, "if he couldn't have her, nobody will." Matthews would also isolate Banks from her family and yell at her to the point that she would become hysterical. Although

Banks never told Henderson directly that Matthews was stalking her, it was Henderson's opinion that Banks believed "[s]omeone was after her."

According to Henderson, on the evening of Banks's death, Henderson, Banks, and Matthews went to church. Henderson testified that she could tell that something was wrong with Banks. Henderson explained that "all of a sudden, [Matthews] gets up and he walked out behind [Banks], and [Banks came] back in and [Matthews came] back in."

Kim Slaughter testified that Banks was her hair stylist and that they eventually became friends who shared confidences with one another. Slaughter testified, "We talked about each other's problems and what we had on each other -- what we had on our minds that maybe we didn't feel comfortable talking to anybody else about." Slaughter explained that the pair did not go out together, but they talked at the hair salon and on the telephone "[v]ery occasionally." Slaughter knew that Banks was in a relationship with Matthews and that Banks and Matthews had made plans to get married at the beginning of their relationship. Slaughter explained that Banks and Matthews's relationship changed over time and that, toward the end of their relationship, Banks did not intend to marry Matthews.

Slaughter said that one day, while she was at the beauty salon, Matthews came in and, after meeting her, made "a very derogatory statement" to her. According to Slaughter, Matthews would sit at the salon on other occasions, and if Matthews was not there, he would call Banks repeatedly, "[o]ne [phone call] after another."[1] She said Matthews would call "[o]ver and over again" and

---

[1]Slaughter explained that, on the day before Banks's death, Matthews made close to 100 telephone calls to Banks, either on her cell phone or the salon's phone. According to Slaughter, Banks did not answer the calls, and she eventually turned off the phones' ringers.

that Banks and Matthews's relationship began to escalate to the point that Matthews would go to the salon and stay there the entire day. Slaughter stated that, "if [Matthews came] up there and [stayed] up there all day," she would consider that to be stalking.

According to Slaughter, she had also seen bruises on Banks's neck.[2] Slaughter believed that Banks was "terrified" of Matthews. Eventually, Banks talked to Slaughter about leaving Matthews. Banks made plans to leave him because their fighting was escalating. The day before Banks's death, she called Slaughter and asked her to spend the day with Banks at the salon. By that time, according to Slaughter, Banks's fear of Matthews had "reached an all-time high." Slaughter said that, when she learned of Banks's death, she went to the scene to tell the investigators what Banks had told her about her relationship with Matthews.

Banks's mother, Alice Runnels, testified that, at the time of Banks's death, Banks had no plans to marry Matthews. Runnels said that Banks told her about the couple's issues and that she had seen for herself the trouble in their relationship. Runnels explained,

> Well, he got to the point that he was -- she couldn't go out with her friends. He always wanted to make sure if she went anywhere, he was always there with her, and if me and her would go somewhere on the weekends, he would ride around, find out where we is, and then he'd find where we was at, and then he'd just drive off.

Runnels was also at the beauty salon the day before Banks's death, along with Banks and Slaughter. When asked if Matthews called Banks at the salon, Runnels said, "Oh, he would call

---

[2]The State alleged that the murder took place the early part of September. Slaughter believed she saw the bruising on Banks's neck in August.

4

up there 24/7." According to Runnels, if Matthews's efforts to contact Banks did not succeed, Matthews would "pop[] up . . . there."

On the day of the incident, Runnels said that Banks was acting "kind of quiet" and that "she wasn't giggly." Runnels explained that, after she went to bed that evening, she received a telephone call from a person who claimed to be Matthews's sister, who told Runnels that Matthews told her to call Runnels and tell her that he could not find Banks. Runnels contacted her sister, and then the two of them went to Matthews's trailer, which was, by that time, a crime scene. When they arrived at the trailer, Matthews was sitting at the back of his truck on the ground. According to Runnels, Matthews did not speak to her. Runnels said that the last time she saw Banks that day, she had no marks or bruising on her body.

Matthews's step-brother, George Matthews (George), explained that he had been subpoenaed and that he did not want to testify. Matthews and George had known each other since the early nineties. According to George, he called Matthews his "brother," and they got along "[j]ust fine."

George testified that, on the night of the incident, around ten or eleven o'clock, Matthews arrived at George's home, but had not called before his arrival.[3] George said he assumed Matthews wanted to "take a ride with him." According to George, Matthews was not crying and did not appear to be upset. While Matthews was at George's house, he went into the bathroom, and when he came out, he handed George a 9mm pistol. Matthews did not tell George why he was giving

---

[3]George shared the home with his girlfriend, Lee Ann Threadgill.

5

him the pistol, but told George "[t]o leave it until [they got] back." George said he complied with Matthews's request and put the pistol in a cabinet in the bathroom.

The pair then got in Matthews's truck and went to downtown Texarkana to a bar, but neither of them went inside.[4] After that, they drove to Ashdown. George said that, at the time, he had no idea why they were going to Ashdown. About half-way to Ashdown, Matthews told George that "[h]e knew [Banks] was gone when some [sh*t] came out her [a*s]." When asked about Matthews's demeanor when he made that statement, George responded, "Well, you know, I was scared of him. I just rode." George said that he understood Matthews's statement to mean that Banks was dead. According to George, Matthews did not seem upset, frantic, or panicked while they were riding around that evening.

Next, George explained that, when the pair arrived in Ashdown, they went to a convenience store to get cigarettes and gasoline. According to George, they both appeared on the security camera in the store. They also went to Matthews's mother's home.[5] While there, George did not get out of the truck. Matthews, however, removed "all the stuff out [of] the back seat" and then took it into his mother's house. George said that Matthews had not mentioned anything about the items being in the back of the truck. George testified that, on the trip back to Texarkana, he did

---

[4]Matthews was the driver of the truck.

[5]Matthews's mother, Mary Kay Matthews, testified that she did not remember the pair coming to her house that night because she was at work.

6

not talk to Matthews. George was "just trying to get back home." In George's opinion, Matthews was a violent person.[6]

After he arrived back home, George put the pistol in the dumpster[7] and then told his girlfriend, Threadgill, what had happened. Shortly after that, Matthews called George from his house, saying, "'It's smoking,' like the house was on fire." George asked Matthews why he was calling him because he should be contacting the police or an ambulance.[8] According to George,

---

[6]George stated that he and his family were living in a hotel because he was afraid for their safety. He also said that he had been harassed for weeks. When Matthews was arrested and detained in jail on the murder charge, the harassment stopped.

[7]George stated that he was on parole in Arkansas as the result of a burglary conviction and that he was afraid that having a gun or being involved in criminal activity might "get [him] in trouble with [his] parole" officer.

[8]At some point, Matthews did, in fact, call 9-1-1. The State offered, and the trial court admitted, the recording of Matthews's 9-1-1 call. During the call, Matthews told the operator that he had just arrived home, that his girlfriend, Banks, was in the bathtub, and that his "house was smoked-up." Matthews said he did not know what had happened. He gave the operator his name and his address in Hooks, Texas. Matthews again said that the house was smoking, but that there was no fire. Matthews repeated that Banks was in the tub, and added, "[S]he ain't even moving." When asked if Banks was breathing, Matthews said he did not know and that "she [was] in the water." The 9-1-1 operator then connected Matthews to ambulance services, at which time an ambulance was sent to his address. Matthews was then asked to "explain about [his] girlfriend." Matthews said that all he knew was that she was in the bathtub and she had her head in the water. He also stated, "[I]t's like a fire had been set, but there's no fire." The operator asked Matthews to go back inside the house, get Banks out of the bathtub, and then get her out of the house. Matthews said Banks was too heavy to lift and that there was no one at the house who could help him. Shortly after that, he told the operator that he had gotten Banks out of the tub, but that he was too tired to pull her any further than he had. The operator told him to go get a sheet or towel so that he could place her on top of it and then pull her out of the house. When Matthews returned to the telephone, he told the operator that he had pulled Banks outside, but that she was not moving. When asked if Banks was awake or breathing, Matthews informed the operator that she was not. By that point in the conversation, Matthews began to sound somewhat frantic, and he told the operator to please get someone to the house to help him. The operator told Matthews that emergency services was already on the way. The operator went on to tell Matthews how to administer cardiopulmonary resuscitation (CPR). Matthews began doing chest compressions and was told to continue them until emergency services arrived. Shortly after he began CPR, emergency services and police officers arrived at the scene. Matthews informed the operator that help had arrived and that he was continuing to do CPR.

Clint Freeman, a patrol officer for the City of Hooks at the time of the incident, responded to the scene. Upon his arrival, he saw Banks's body on the ground in front of the front door and Matthews on his knees beside her. Freeman said that it appeared Matthews was in a position where he could administer CPR, but he never saw Matthews administering chest compressions. Freeman testified, "He just leaned back, and like I said, he asked me for help, and he just sat back while I continued to do chest compressions." Freeman said he did not recall Matthews asking him whether Banks was alive or about Banks's condition. Freeman said Matthews did not try to touch Banks or comfort her. When asked if Freeman had to tell Matthews to stay back, Freeman said, "He stayed back. I never had to tell

7

Matthews hung up the telephone and then called George a second time, telling him that he was pulling Banks out of the tub. Again, Matthews hung up and then called George a third time. On the third phone call, Matthews told George that he was leaving with the police department and the fire department.

George admitted that, when he first spoke to the police, he did not tell them that Matthews had confessed to murdering Banks. George said that, during the time when he was speaking to investigators, Matthews was contacting him. "It was like every time I got through talking, [Matthews] was there." George explained that Matthews would ask George what he told the investigators and whether he was cooperating with them. According to George, he told Matthews that he lied to the investigators. George said that he did not want to get involved because he was on parole at the time,[9] and he was worried about his safety and the safety of his family. George testified, "Yes. I'm worried about it right now."

On cross-examination, George also admitted that he had lied to the investigators about how many times he had been arrested. George conceded that he had lied when he was first asked whether he had gone to Ashdown. When asked why he lied, George said, "Because I was scared to tell them I went to Ashdown." In addition, George had told investigators that the purpose of the trip to Ashdown was to sell drugs, but he later said that that was not the reason they had gone to Ashdown. He also told the officers that the drugs belonged to Matthews. Most notably, however,

---

him to stay back. He, he just, just sat there." According to Freeman, he did not feel like Banks was alive because he "could tell by the touch -- she was cold, clammy to the touch, motionless, was not breathing."

[9]George was not on parole at the time of trial.

George admitted that, in the past, when the investigators asked him if Matthews had said anything to him about Banks's death, he told them that Matthews had not.

Jerl Palmore, who, at the time of the investigation, was an investigator for the Bowie County Sheriff's Office, testified that, when he arrived at the scene, Matthews was still at the house. Palmore said that, at one point, he witnessed Matthews "messing with the lawnmower." He continued, "[W]hen I stepped up, I could see he was . . . causing gasoline to run onto his hands." Palmore told Matthews to stop, that they would need the clothes he was wearing, and that he did not want them to be contaminated. As they began to enter the house, Palmore told Matthews not to touch anything in the home. Yet, the first thing Matthews did when he went inside the house was put his hand on a liquor bottle. Palmore said that, after just a few moments, it became evident that he needed to take Matthews out of the house because, in his opinion, he would try to contaminate it. According to Palmore, Matthews's behavior was "[a]bsolutely" suspicious. Palmore also stated that Matthews did not act like a person whose girlfriend had just died. Palmore stated, "It appeared more like somebody that had found their neighbor deceased."[10]

Scottie Taylor, an investigator with the Bowie County Fire Marshal's Office, was also called to the scene. Taylor stated that, during his investigation, he created a crime scene diagram.[11] Using the diagram, Taylor testified that, among other things, he looked at various things on the inside of the home, including the electrical outlets, light switches, and fixtures in the bathroom.

---

[10]Matthews's sister, Marnisha Matthews (Marnisha), stated that she received an unexpected telephone call from Matthews the night of the incident. According to Marnisha, Matthews was emotional and she "could tell his heart was racing." She stated, "He was crying, and it was like he was just speechless. Just disbelief." Marnisha said that Matthews told her that, when he had gotten home, he found Banks nonresponsive in the bathtub.

[11]The diagram was admitted into evidence without objection.

9

After doing so, he concluded that there was no evidence of any type of electrical malfunction and that the fire was not accidentally started. Taylor said that there was "a smell of light smoke and also a chemical -- and there was a hydrocarbon smell, possibly." Samples were later sent to the laboratory, where it was determined that the substance was gasoline.

Taylor also explained that, while he was in the home, he noticed a lack of clothing or shoes in the closet. Taylor said, "That is one factor in an incendiary or arson fire, that you have absence of content and clothing." He continued, "The people want to remove the items and -- so they don't lose them." According to Taylor, several of the doors in the house had rags under them. It was Taylor's opinion that someone was attempting to block the airflow in an attempt to allow the fire to continue burning. But, Taylor explained, "in all actuality what it does is it helps put the fire out because it blocks oxygen."

William Buttram, an investigator for the Bowie County Sheriff's Office at the time of the incident, inspected the damage to Matthews's home. Buttram said that he found a thin layer of soot in the bathroom, along with several bottles of cleaning materials in a bucket. Behind the bucket, there was also a bottle of Pine-Sol. He described the room as having a chemical smell. Buttram explained that the cleaning products were in the bathroom before the fire, because there was soot on the bottles. According to Buttram, someone had tried to clean the bathroom, and then set fire to the house. Buttram stated, "Well, obviously, we thought [Matthews] -- someone was trying to cover up a murder, very likely, and cover up her death. And hide [the] evidence." Buttram also explained that there were slippery-looking marks and shoe prints on the floor.

10

Buttram stated that he believed some of the soot had gotten on Banks's body when Matthews drug her out of the bathroom, most likely, face down.

According to Buttram, there was no evidence that someone had broken into Matthews's home. Moreover, Buttram stated that, during the span of several years of investigating Banks's death, there had been no credible information of any kind that any individual other than Matthews had been responsible for Banks's murder.[12]

William McClain, M.D., a medical examiner with Bexar County,[13] testified about the results of Banks's autopsy. Among other things, McClain stated that the autopsy showed that Banks had suffered from asphyxia, as well as blunt force injuries to her head, her trunk, and her upper and lower extremities. The autopsy findings concluded that Banks died as a result of asphyxia and blunt force injuries. "There was no soot in the airways and the carbon monoxide level [was] not elevated, verifying that the fire did not contribute to [Banks's] death."[14] The autopsy findings stated that the manner of Banks's death was "[h]omicide."[15]

After hearing the evidence, the jury determined that Matthews was guilty of murdering Banks. He was sentenced to life in prison. This appeal followed.

---

[12]Buttram also said that he found it odd that, on the day after Banks's death, Matthews contacted a captain in the sheriff's office and asked him if it was all right for him to go to "the boats," presumably to gamble.

[13]McClain was a medical examiner in Dallas County at the time he performed Banks's autopsy. Dallas County handles autopsy services for Bowie County.

[14]McClain stated that, although Banks's external "body surface had some soot or ash on it at the time she was received into [his] office, there was no soot, no ashes in her airway, on her mouth or tongue, any of that, and certainly not down into her trachea or into the distal parts of her lungs." In other words, McClain opined that Banks did not die as a result of the fire.

[15]Banks was also subjected to a sexual-assault examination. The results of the examination showed that there was semen in her vagina, blood in her anus, and blood in her mouth.

**II.     Discussion**

In his sole point of error, Matthews contends that the evidence was insufficient to support the jury's verdict of guilt. In evaluating legal sufficiency here, we must review all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found, beyond a reasonable doubt, that Matthews was guilty of murder. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

A person commits murder "if he intentionally or knowingly causes the death of an individual." Tex. Penal Code Ann. § 19.02. "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective

12

or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03. Here, the

State's indictment against Matthews alleged that,

> on or about <u>September 8, 2013</u>, [Matthews] did then and there, with intent to cause serious bodily injury to an individual, namely, <u>Sonjha Banks</u>, commit an act clearly dangerous to human life that caused the death of said <u>Sonjha Banks</u>, by <u>causing blunt force injuries by hitting Sonjha Banks with or against an unknown object and/or impeding the normal breathing or circulation of the blood of Sonjha Banks by applying pressure to the throat or neck and/or blocking the nose or mouth of Sonjha Banks</u>.

On appeal, Matthews argues only that "[t]he evidence was legally insufficient to show that [he] was the murderer." He maintains that "[o]nly by speculation can [he] be identified as the murderer."[16] We disagree.

The State may prove Matthews's identity by either direct or circumstantial evidence, along with reasonable inferences from that evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986). "Circumstantial evidence is as probative as direct evidence," and "circumstantial evidence alone can be sufficient to establish [a defendant's] guilt." *Hooper*, 214 S.W.3d at 13. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Id.* (citing *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)).

The Texas Court of Criminal Appeals has explained that inference stacking, i.e., the drawing of a series of multiple reasonable inferences based on direct or circumstantial evidence, can amount to a proper reasoning process. *Id.* at 15–17. As the court held, "Rather than using the

---

[16]Other than the identity issue, Matthews does not challenge the sufficiency of the State's evidence as it relates to the remaining elements of proof.

13

language of inference stacking, courts of appeals should . . . determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all evidence when viewed in the light most favorable to the verdict." *Id*. at 16–17 (citing *Jackson*, 443 U.S. at 318–19).

Here, there was plenty of evidence that supported the jury's verdict that Matthews was the person who murdered Banks. Matthews had a history, known to those individuals who spent time with Banks and Matthews, of emotionally, if not physically, abusing Banks. The evidence showed that Matthews either tried to control, or did control, Banks's movements and that he isolated Banks from her family and friends. Matthews would unexpectedly show up at the beauty salon while Banks worked and would stay for excessively long periods of time. If he was not present at the salon, he would call her continuously, to the point that Banks would disconnect the telephones.

Henderson testified that Banks had always been a happy person and usually had a smile on her face. Yet, there was evidence that, after Banks began dating Matthews, she became quiet and withdrawn, personality traits that, before their dating relationship, Banks did not exhibit. Henderson also testified that Banks was afraid of Matthews. Slaughter said that Banks was terrified of Matthews and that Banks's fear of Matthews had "reached an all-time high." There was evidence that Banks was ending her relationship with Matthews because their fighting had escalated. As for ending the relationship, Henderson testified that Matthews commented that, if he could not have Banks, nobody would.

There was also evidence that, on the day of her murder, Banks was acting unusual and that her friends and family sensed that something was upsetting her. On that same day, Banks told

14

Henderson, in what was described as a serious tone, that she needed to talk to Henderson. Yet, before Banks had a chance to do so, she was murdered. Slaughter also testified that, the day of Banks's murder, she had asked Slaughter to spend the day at the salon with her. Slaughter said that, when she learned of Banks's death, she immediately went to the scene to tell the investigators what Banks recently told her about Banks's deteriorating relationship with Matthews.

George said that Matthews unexpectedly showed up at his house the night Banks was killed and handed George a gun, without giving him any kind of explanation. In addition, while George and Matthews were on their way to Ashdown that evening, Matthews told George that he knew Banks "was gone" because "some [sh*t] came out of her [a*s]." George testified that he interpreted Matthews's comment as meaning that Banks was dead. George also opined that Matthews was a violent person. In fact, George was afraid of Matthews and worried about his and his family's safety as it related to George appearing as a witness at Matthews's trial. There was also evidence that Matthews contacted George about the incident and unexpectedly showed up after George had spoken to investigators to inquire as to what George had told them. According to George, the harassment ended after Matthews went to jail while he waited for his trial to begin.[17]

As to the scene of the murder, which was Matthews's home, there was no evidence that anyone had broken into his residence. Matthews was the only person identified as being in the house with Banks. Moreover, there was evidence that someone tried to clean up the bathroom, the room where Matthews first located Banks; that someone tried to set fire to Matthews's house to

---

[17]Although there was evidence that George's version of events throughout the investigation changed, the jury, as the trier of fact, was the sole judge of the credibility of all the witnesses and the weight given to the evidence. *See Fuentes v. State*, 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). As always, the jurors were free to believe or disbelieve part, all, or none of George's testimony. *See Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998).

15

cover up Banks's death; and that Matthews tried to contaminate evidence even after officers arrived at the scene.

Finally, McClain, the medical examiner, concluded that the fire did not contribute to Banks's death, but that Banks died as a result of asphyxia and blunt force trauma. McClain also pointed out that several of Banks's injuries were consistent with a struggle, an attack, and fight situations.

We, therefore, find, giving proper deference to the jury's verdict, that the cumulative force of the foregoing evidence was sufficient to support the several inferences that Matthews was the person who killed Banks.

We overrule Matthews's sole point of error.

## III.    Conclusion

We affirm the trial court's judgment.


Scott E. Stevens
Justice

Date Submitted:     December 12, 2019
Date Decided:       January 16, 2020

Do Not Publish